# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMSC-001

Filing Date: December 1, 2008

Docket No. 30,210

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

JESUS ROBERTO ZAMARRIPA,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Mark A. Macaron, District Judge

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant


Gary K. King, Attorney General
Max Shepherd, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

SERNA, Justice.

{1}    This case comes to us on direct appeal from a life sentence pursuant to Rule 12-102(A)(1) NMRA. A jury convicted Jesus Zamarripa (Defendant) of first degree murder (depraved mind), contrary to NMSA 1978, Section 30-2-1(A)(3) (1994); shooting at or from a motor vehicle resulting in great bodily harm, contrary to NMSA 1978, Section 30-3-8(B) (1993); conspiracy to commit shooting at a motor vehicle resulting in great bodily harm, contrary to NMSA 1978, Sections 30-28-2(A) (1979) and 30-3-8(B); and two counts of

1

aggravated assault with a deadly weapon, contrary to NMSA 1978, Sections 30-3-2(A) (1963) and 31-18-16(A) (1993).[1] Although Defendant raises several issues on appeal, we reach only one: that he was denied the right to confront a critical witness against him at trial. On this ground, we vacate his convictions and remand for a new trial.

## I.    BACKGROUND

### A.    Facts

{2}    In the early evening hours of April 15, 2004, a skirmish arose between six men riding in two separate cars near Central Avenue in Albuquerque. Defendant was riding in a silver or gold Saturn with Johnny Baca and his son, Ray Baca. Christopher Arena (Victim), Arellano Navarro, and Anthony Rubio were in a black Explorer. Shots were fired at two different intersections: 55th and Churchill and Central and Atrisco. Victim was struck in the head. After the second encounter, the Explorer went to a car wash where it was met by an ambulance to treat Victim. Defendant and the Bacas were stopped by law enforcement within minutes; Ray Baca had a gunshot wound to the hand. Victim subsequently died of his gunshot wound.

{3}    The State's theory of the case was that Defendant and the Bacas had pursued the Explorer and shot at its occupants because of a gang rivalry. It alleged that, though Defendant was not a gang-member, the Bacas were members of the Los Padillas gang and the occupants of the Explorer had ties to the TCK gang. The State presented evidence that the hat victim had been wearing identified him as a member of TCK.

{4}    To support this theory, the State introduced an out-of-court statement by Ray Baca that he gave to investigators on the night of the shooting. In the statement, Baca said that, while Defendant was not a gang member, both Baca and Defendant recognized that the occupants of the Explorer were part of the TCK gang, a gang that they had "had trouble with." Baca stated that gang signs were thrown between the two cars and then the Explorer began shooting at them. He did not admit to shooting at the Explorer; he maintained that the only shots fired had come from the Explorer. Baca also said that, just prior to the shots being fired, he saw the occupants of the Explorer hanging out of the windows and yelling, though he did not see a gun.

{5}    The State used Baca's statement in two ways. First, it used Baca's recognition that he did not see the gun allegedly wielded by the occupants of the Explorer to argue that they did not have a gun and that Defendant was not acting in self-defense, as he claimed. Second,

---

[1]The jury also convicted Defendant of second degree murder, contrary to NMSA 1978, Section 30-2-1(B), but that conviction and sentence merged with the first degree murder conviction and sentence.

the State used Baca's admission that the shooting was gang related to show motive and as foundation for a gang expert who testified about the rivalry between Los Padillas and TCK and how the altercation may have escalated.

**{6}** The defense theory was that Victim's injury was "friendly fire" inflicted by one of the other occupants of the Explorer, and that Victim's car fired upon Defendant's car first and that Defendant had only returned fire in self-defense. While neither Defendant nor Johnny Baca testified, Baca's statement supports this claim in that he stated that the Explorer was the first to shoot. Nevertheless, in an apparent attempt to keep the gang evidence away from the jury, defense counsel opposed the admission of Baca's statement.

**{7}** As for the surviving occupants of the Explorer, they denied that there was "maddogging" (staring), yelling, or gang-sign flashing just prior to the shooting. One of them denied that the shooting was gang-related. They both denied ever firing a gun at the Saturn or having one in their possession.

**{8}** Although there was evidence that at least two guns were fired—casings from two separate guns were found at the intersections where shots were fired [], there was a bullet hole in the Saturn, and witnesses reported that the cars were shooting at each other—only one gun was recovered by the police, and it was found in Defendant's car. Police did not find a gun in the Explorer. It is unclear whether investigators searched for a gun along the path that the Explorer traveled before making contact with the police.

## B.    Proceedings Below

**{9}** At Defendant's trial, Baca, who was awaiting the outcome of his own appeal for the incident, invoked his Fifth Amendment privilege against self-incrimination to avoid testifying. *See* U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself."). The State moved for an order to compel Baca's testimony based on his statement and grant him use immunity. *See* Rule 5-116 NMRA (giving district courts the authority to compel witnesses to testify and immunize them from further prosecution). The use immunity was intended to protect Baca from use of his compelled testimony in any future proceeding against him, *see* Rule 11-412 NMRA (precluding the use of evidence obtained under an immunity order), and was offered by the State in an apparent attempt to avoid defeating his confrontation rights under *Crawford v. Washington*, 541 U.S. 36 (2004). However, the scope of the immunity only covered Baca's verification of the accuracy of the transcript of his statement; he was not immune from future prosecution based on his answers to substantive questioning on the events described in the statement.

**{10}** Defense counsel argued numerous times that admitting the transcript of the Baca statement while he had no opportunity to cross-examine Baca would circumscribe Defendant's rights under *Crawford*. However, over Defendant's objection, the court granted the State leave to give limited use immunity to Baca so that it could compel him to take the stand and verify that the transcript of his statement accurately reflected what he had told the

3

investigator the night of the shooting.

**{11}** At this point in the trial, there was a lengthy colloquy between the prosecutor, defense counsel, Baca's attorney, and the court about how to proceed with Baca's statement while remaining cautious about Baca's Fifth Amendment privilege, the *Crawford* issue, and the potential prejudice to Defendant if Baca invoked the privilege on the stand. During the exchange, Baca's attorney tried to clarify the scope of the use immunity. The State proposed several options for the form that its questions to Baca could take so as to avoid inadvertently coaxing him beyond the immunity granted. Baca's attorney expressed concern about the nature of the questioning; specifically, he thought that the State's proposed questions went to the substance of Baca's statement while the order granting use immunity only covered questions about the statement itself.

**{12}** The court asked whether defense counsel had any input; defense counsel asked whether the written transcript of Baca's statement would be going to the jury. When asked by the court whether he wanted the written transcript to go to the jury, defense counsel answered, "I think I do want it. If we are going to get into it, I think the whole thing has to go in . . . . We wouldn't have to walk [Baca] through 'Did you say this, did you say that.'" Defense counsel said that Baca's concerns would be addressed by putting the written statement itself in "so then we are not going through [the] wording of questions." He continued that "it may . . . be less prejudicial considering the rulings made, to the defense."

**{13}** The court suggested that both sides stipulate to the statement in an effort to "avoid the risks of expanding the field and questions about what's protected and what's not." The State said that it would stipulate to the statement but then asked whether Defendant, by stipulating to the statement, was waiving his right to cross-examine Baca. Defense counsel replied: "I am not waiving *Crawford* . . . . I haven't waived *Crawford* and I don't intend to . . . ."

**{14}** The court then responded to defense counsel:
> I recognize you made arguments on the record regarding *Crawford*, I am not asking you to waive what you have argued, but the fact is that at this point, if the statement goes in, you would be foregoing any further questions regarding that now. Is that—would that work for you?

Defense counsel asked, "Is the Court saying the only way the statement can go in in a written form is if I forego any further cross-examination?" The court replied, "No . . . I didn't say that. I am wondering if that might be a substitute for having Mr. Baca basically sit on the stand and affirm the statement and sit on the stand and answer to you that he is going to assert the fifth."

**{15}** Defense counsel then suggested that Baca could affirm the validity of the transcript and then assert his Fifth Amendment privilege to any other questions. He added that "I don't see where . . . that itself is error or following that manner of proceeding at this point is not going to cause any error." The prosecutor stated that without Defendant waiving *Crawford*,

they could not merely stipulate to the statement. The court agreed. The prosecutor continued that she could have Baca testify to the statement and then let Defendant cross-examine him, and Baca would still be able to assert the privilege if defense counsel got outside of the original testimony.

{16}    Defense counsel then interjected with:

> Is what the Court—maybe I missed the Court's—wants me to consider at this point waiving cross-examination at this point so the statement comes in, in lieu of verifying the statement and then possible cross-examination? The Court is saying by waiving any cross-examination at this point in the proceedings we could put the statement in and both sides would waive cross?

When the court answered in the affirmative, defense counsel replied that he would be willing to do that. However, when asked if it was willing, the State responded that it would like to stipulate to the statement and still put Baca on the stand to verify the transcript.

{17}    Baca's attorney again expressed concern that the State would ask Baca questions about the substance of the statement. The State assured Baca's attorney and the court that it would only ask about what Baca had told the investigator: "the question . . . would be, 'Is that what you told [the] [d]etective?' . . . I am not asking, 'Is that what happened?' But I am asking, 'Is this a fair representation of what you told her that night?'"

{18}    After ensuring that Baca's attorney and the State were in agreement as to the form of the State's questions to Baca, the court asked defense counsel, "[i]s that going to work for you?" Defense counsel responded "in light of where we are in the legal rulings, that is adequate. That's a fair way to address it." The court then told defense counsel that it needed to offer him the opportunity to cross for the record. Defense counsel said that he might ask Baca a question about his hand injury. The court asked Baca's attorney if there was a problem with Defendant asking about the hand injury. Baca's attorney responded no, but he would be concerned about too many more questions cumulatively implicating Baca's privilege against self-incrimination. The court said that it "need[ed] a commitment" in order to reach an agreement. It asked defense counsel: "[d]o you agree that would satisfy your need to cross?" Defense counsel answered that it would. The court stated again that it wanted to be sure for the record that defense counsel was comfortable asking only one question of Baca and that he agreed to waive further cross. Defense counsel said that he was, at that point. He then stated that the defense opposition to the order compelling testimony and granting use immunity was not noted on the order, but that he signed it "as to form."

{19}    The State then put Baca on the stand to verify the accuracy of the transcript. The prosecutor asked him whether he had had a chance to review the transcript and whether it "accurately reflect[ed]" and was "a fair representation" of what he remembered telling the investigator. Baca answered affirmatively. As stipulated, Baca's statement was admitted

5

to evidence. Defense counsel did not conduct any cross-examination of Baca.

**{20}** The jury returned a verdict against Defendant on six of eight charges and he was sentenced to life plus two years imprisonment.

## II. DISCUSSION

**{21}** Defendant claims that Baca's statement was admitted in violation of the Confrontation Clause of the Sixth Amendment to the U.S. Constitution as interpreted by *Crawford*. *See* U.S. Const. amend. VI; *Crawford*, 541 U.S. at 53-54. He argues that admission of Baca's statement when Defendant did not have the opportunity to cross-examine Baca on its contents defeated his constitutional right to confront the witness against him. *See Crawford*, 541 U.S. at 53-54. We agree.

**{22}** We review admission of statements alleged to be in violation of *Crawford* de novo. *State v. Dedman*, 2004-NMSC-037, ¶ 23, 136 N.M. 561, 102 P.3d 628. Defendant did not argue that the New Mexico Confrontation Clause, N.M. Const. art. II, sec. 14, afforded more rights than the United States Confrontation Clause, U.S. Const. amend. VI, so we address only the federal Constitutional provision. *See State v. Gomez*, 1997-NMSC-006, ¶¶ 22-23, 122 N.M. 777, 932 P.2d 1.

### A. Defendant's Constitutional Right to Cross-Examine the Witness Against Him Was Violated

**{23}** "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. Out-of-court testimonial statements are barred under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court. *Crawford*, 541 U.S. at 68; *State v. Johnson*, 2004-NMSC-029, ¶ 7, 136 N.M. 348, 98 P.3d 998. Specifically, "an accomplice's testimonial statement [is] inadmissible under the Confrontation Clause unless the accomplice [is] unavailable and the defendant had a prior opportunity to cross-examine the accomplice *concerning the statement*." *State v. Henderson*, 2006-NMCA-059, ¶ 15, 139 N.M. 595, 136 P.3d 1005 (internal quotation marks and citation omitted).

**{24}** The nature and circumstances of Baca's statement reveal that its admission was a paradigmatic *Crawford* violation. First, the statement falls under the purview of *Crawford* because it was testimonial. "Statements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard." *Crawford*, 541 U.S. at 52; *State v. Romero*, 2006-NMCA-045, ¶¶ 49-50, 52, 139 N.M. 386, 133 P.3d 842. Statements are testimonial when there is no ongoing emergency and the "primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006).

6

**{25}** Here, Baca gave his statement in response to formal police interrogation. He had been mirandized. He was at a police station answering the questions of an investigator and his statement was tape recorded. *See Romero*, 2006-NMCA-045, ¶ 52 (holding that a statement made at a police station in response to police questioning that was tape recorded bore the indicia of formal police interrogation and was thus testimonial). Further, Baca made the statement at a time when the urgency of the shooting had ceased and the efforts of the police had shifted from ensuring safety in an ongoing emergency to "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." *See Davis*, 547 U.S. at 822. For these reasons, Baca's statement was testimonial and thus within the scope of *Crawford*.

**{26}** Having determined that the statement was testimonial, the propriety of its admission depends upon whether the two *Crawford* requirements were met. First, Baca must have been unavailable to testify to the contents of the statement at the time of Defendant's trial, and second, Defendant must have had a prior opportunity to cross-examine Baca on the contents of the statement.

**{27}** "'Unavailability as a witness' includes situations in which the declarant . . . is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement . . . ." Rule 11-804(A)-(A)(1) NMRA; *McGuinness v. State*, 92 N.M. 441, 444, 589 P.2d 1032, 1035 (1979). Baca invoked his Fifth Amendment privilege against self-incrimination and was therefore unavailable to be cross-examined. Thus, the "unavailability" requirement of *Crawford* is met. We turn to the next requirement.

**{28}** It is undisputed that Defendant had no opportunity to cross-examine Baca on the contents of the statement prior to Defendant's trial. However, the State claims that Defendant had an opportunity to cross-examine Baca *during* Defendant's trial. This argument is belied by the facts as they are presented in the record. As discussed above, Baca invoked his Fifth Amendment privilege to avoid testifying at Defendant's trial; his attorney plainly stated that he was invoking his Fifth Amendment privilege and was "not willing to testify" on at least two occasions. The State stipulated that Baca had invoked his Fifth Amendment privilege.

**{29}** If the State means to argue that Defendant had an opportunity to cross-examine Baca by virtue of the use immunity, that claim is similarly without merit. The order granting use immunity stated that the immunity extended only to Baca's testimony "regarding the statement he made to [the police]." In attempting to clarify the nature of the immunity granted, Baca's attorney illuminated the situation thus:

> If the question is, 'Is that what happened,' do we still have immunity from that? . . . Because to me that's not asking him about the statement he made to [the police]. It's asking him about the events . . . and as I read the proposed form of Order, we are talking only about immunity with regard to

> evidence he made, the testimony he may give, with regard to the statement
> he made to [the police].

The prosecutor confirmed the impression of Baca's attorney regarding the restricted nature of the immunity: "[t]he question . . . would be, 'Is that what you told [the police] what happened on that night?' . . . I am not asking, 'Is that what happened?' But I am asking, 'Is this a fair representation of what you told her that night?'"

**{30}** Defense counsel contested the limited scope of the use immunity and its effect on his client's *Crawford* rights:

> [w]e reiterate our arguments . . . made prior to the trial beginning regarding the *Crawford* problems. We still feel there's some restriction if the testimony is permitted without the opportunity to fully cross-examine him. We realize the State is attempting to obviate that by seeking the motion . . . [b]ut we do not concur in the motion. We still want to be able to fully cross-examine the gentlemen if he testifies at all . . . we are in opposition because we feel it's too restrictive in cross-examination."

If Baca was available to be questioned on the substance of the statement or the events described therein, surely the State would have asked more of him than whether the transcript "accurately reflect[ed]" and was a "fair representation" of what he told the police on that evening. When Baca was on the stand, he was compelled there for the narrow purpose of verifying the accuracy of the transcript of his statement, not for answering any substantive questions on the statement itself or the events described therein.

**{31}** While Defendant may have been able to cross-examine Baca regarding the accuracy of the transcript of his statement, that limited questioning does not satisfy the demands of the Confrontation Clause. We have held on numerous occasions that, when confronted with an accomplice's statement, a defendant's rights to confront are only satisfied where he or she is allowed the opportunity to cross-examine the accomplice *on the statement*. *See, e.g.*, *State v. Forbes*, 2005-NMSC-027, ¶ 3, 138 N.M. 264, 119 P.3d 144 (holding that an accomplice's statement was inadmissible where the defendant "was deprived of the opportunity to cross-examine [the accomplice] to challenge the reliability of his statement"); *State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 24, 136 N.M. 309, 98 P.3d 699 (holding that, where the defendant had no opportunity to cross-examine the accomplice on the accomplice's testimonial statements, admission of the statements violated the Sixth Amendment); *Johnson*, 2004-NMSC-029, ¶ 6 (holding that an accomplice's statement was inadmissible where the defendant did not "at any time have an opportunity to cross-examine [the accomplice] on his statement"); *Henderson*, 2006-NMCA-059, ¶ 16 (holding that a "prior *opportunity* to cross-examine *the statement*" was a prerequisite to the testimonial statement's subsequent admission at trial); *State v. Duarte*, 2004-NMCA-117, ¶ 10, 136 N.M. 404, 98 P.3d 1054 (holding that an accomplice's testimonial statement was inadmissible "unless the accomplice was unavailable and the defendant had a prior opportunity to cross-examine the

accomplice concerning the statement").

**{32}** Admission of Baca's testimonial statement when Defendant did not have a prior opportunity to cross-examine him on its substance violated Defendant's right to confront. Baca's statement was admitted without regard to that "central concern of the Confrontation Clause[:] . . . to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Lilly v. Virginia*, 527 U.S. 116, 123-24 (1999) (internal quotation marks and citation omitted).

**B.     Defendant Preserved His *Crawford* Argument**

**{33}** Having determined that Defendant's rights under the Sixth Amendment were violated by admission of Baca's statement, we turn to the question of whether he preserved the issue for appellate review. Even constitutional rights may be lost if not preserved below. *See State v. Silva*, 2008-NMSC-051, ¶ 15, 144 N.M. 815, 192 P.3d 1192 ("[T]he loss of the fundamental right to cross-examine is not necessarily fundamental error."). "To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked . . . ." Rule 12-216(A) NMRA. A party must assert its objection and the basis thereof with "sufficient specificity to alert the mind of the trial court to the claimed error." *Silva*, 2008-NMSC-051, ¶ 9 (internal quotation marks and citation omitted).

**{34}** Defendant fairly invoked a ruling by the trial court with his numerous objections to the admission of Baca's statement without an opportunity for Defendant to cross-examine Baca on its contents. For example, defense counsel stated just before trial: "Mr. Baca . . . is not testifying . . . . If Mr. Baca is uncross-examinable . . . I think that's a violation . . . . [W]e are left with a situation where it's a violation of *Crawford* and a violation, I believe, of the proper cross-examination."

**{35}** When, at trial, Baca invoked his Fifth Amendment privilege, defense counsel repeated his arguments. He stated: "the *Crawford* problem that we have . . . we are unable to cross-examine [Baca]" and "[w]e reiterate our arguments . . . made prior to the trial beginning regarding the *Crawford* problems. We still feel there's some restriction if the testimony is permitted without the opportunity to fully cross-examine him." Defendant objected with "sufficient specificity to alert the mind of the trial court" to the *Crawford* problem. *See Silva*, 2008-NMSC-051, ¶ 9 (internal quotation marks and citation omitted).

**{36}** We note that, although the dissent does not directly contest our conclusion that Defendant preserved *Crawford*, it seems troubled by defense counsel's incorporation during trial of arguments made pretrial and reference to the court's previous ruling in making the *Crawford* argument. Dissenting Opinion, ¶¶ 70, 71, 74, 76. The lack of clarity was owing to the fact that the *Crawford* issue was initially due to the State's intended introduction of Baca's statement when Baca was going to invoke the Fifth and then persisted when the

9

State's granted immunity was too narrow in scope to allow Baca to testify substantively. Nevertheless, we conclude that the Defendant sufficiently alerted the mind of the trial court to the error and that the issue was properly preserved.

**C.      Defendant Did Not Waive His Right to Cross-Examine Baca**

**{37}**      Next, the State argues—and the dissent concurs—that Defendant waived his right to cross-examine Baca.  In support of this argument, the State points to the fact that defense counsel agreed that both sides would stipulate to admission of Baca's statement and then waive cross-examination.  The dissent adds that Baca's statement was not admitted "in lieu of live testimony except at Defendant's prompting."  Dissenting Opinion, ¶ 67.  The State also contends that defense counsel waived the objection by not asking any questions of Baca when it actually came time to cross-examine him.  Both the State and the dissent posit that Defendant waived his *Crawford* objection for tactical reasons, because Baca's statement corroborated Defendant's claim that the occupants of the Explorer fired first and that he was acting in self-defense.  We will address each argument in turn.

**{38}**      Waiver is the "intentional relinquishment or abandonment of a known right or privilege." *State v. Padilla*, 2002-NMSC-016, ¶ 18, 132 N.M. 247, 46 P.3d 1247 (internal quotation marks and citation omitted).  A waiver must be knowing and voluntary. *Id.* There is a presumption against the waiver of constitutional rights. *Brookhart v. Janis*, 384 U.S. 1, 4 (1966).

**{39}**      As an initial matter, the dissent contends that the "State intended to introduce the statement's substance through directly questioning Baca, without restricting Defendant from cross-examining him about the statement."  Dissenting Opinion, ¶ 68. We respectfully submit that our colleague misapprehends the nature of the order to compel and grant use immunity. The motion was drafted to extend only to statements verifying the transcript. The restrictions placed on Defendant inhered in the terms of that motion, which excluded any substantive questioning on the statement.

**{40}**      Next, the State and the dissent make what initially appears to be a strong argument that, by stipulating to admission of Baca's statement and stating that he would waive cross-examination of Baca, defense counsel waived his *Crawford* objection.  However, study of the transcript reveals that this occurred only *after* the court had granted the State's motion for limited use immunity and thereby rejected Defendant's *Crawford* argument.  From the time the limited use immunity was conferred, Defendant was not in a position to waive his right to full cross-examination under *Crawford* because full cross-examination was no longer available to him, per the scope of the immunity granted.

**{41}**      The possibility of stipulation to Baca's statement arose as a way to end the prolonged debate on the form the State's questions would take to elicit the information the State desired from Baca without inadvertently having him incriminate himself.  The court suggested that both sides might stipulate to the transcript to "avoid the risks of expanding the field and

10

questions about what's protected and what's not."

**{42}** The State said that it would stipulate to the statement but then asked whether Defendant, by stipulating to the statement, was waiving his right to cross-examine Baca. Critically, defense counsel replied:

> *I am not waiving Crawford.* I think the questions I asked are going to be answered with the Fifth Amendment. That was made prior to the Court's ruling. The Court considered [*Crawford*] and made its decision, and counsel and the client respect that decision, but I think I haven't waived *Crawford* and I don't intend to, but I think within this purview, . . . . If [Baca] takes the fifth amendment, I am stuck with that. That doesn't waive *Crawford . . . . the Crawford argument has been considered and rejected* as far as applicable to whether [Baca] can testify summarily in the Court's ruling . . . . *I would be willing to stipulate without waiving Crawford.* I am saying at this point my *Crawford* argument was much stronger, was asserted prior to the Court's ruling. At this point it really doesn't make much difference. The Court has said this statement is coming in, so I am saying if it's coming in, put it [sic] in the statement. I know I'm not going to get anything more out of [Baca] because that's the terms that inure . . . in the order. The terms are the statement comes in, [Baca] doesn't have to testify, can still assert his fifth . . . . The Court rejected [the *Crawford* argument] and we will proceed.

The court then responded to defense counsel: ". . . I recognize you made arguments on the record regarding *Crawford*, *I am not asking you to waive what you have argued*, but the fact is that at this point, if the statement goes in, you would be foregoing any further questions regarding that now. Is that—would that work for you?" Defense counsel asked, "[i]s the Court saying the only way the statement can go in in a written form is if I forego any further cross-examination?" The court replied, "[n]o . . . I didn't say that."

**{43}** However, when defense counsel asked whether the court was asking him to consider waiving cross-examination "so that the statement comes in, in lieu of verifying the statement and then possible cross-examination," the court answered in the affirmative. Defense counsel agreed to this procedure. The State then said that it would stipulate to the statement but still wanted to put Baca on the stand to verify the transcript. After a final clarification between Baca's attorney and the prosecutor on the form that the State's questions to Baca would take, the court asked defense counsel, "[i]s that going to work for you?" Defense counsel again responded "*in light of where we are in the legal rulings*, that is adequate. That's a fair way to address it."

**{44}** In response to the dissent's conclusion that Defendant waived his right to cross-examine Baca because "Baca's statement was not admitted in lieu of live testimony except at Defendant's prompting," Dissenting Opinion, ¶ 67, we respectfully submit that our colleague misconstrues the nature of the live testimony that was available to Defendant after

11

the court granted the State's motion. Rather than alleviate the *Crawford* problem, as the State and the court may have intended, the order to compel Baca's testimony and immunize him from prosecution thereon actually perfected the *Crawford* problem because it ensured that Baca would testify only to the extent of verifying the accuracy of his statement.

**{45}** The narrow scope of the immunity granted was problematic in that it did not allow for substantive questioning or full cross-examination of Baca. Rather, any opportunity that Defendant may have had to cross-examine Baca was lost per the terms of the order, because the immunity granted did not extend as far as would have allowed Baca to be fully cross-examined on his statement. Thus, from the time the very limited immunity was conferred, full cross-examination of Baca—such that would have satisfied *Crawford*—was not on the table. Any subsequent negotiation or acquiescence on the part of defense counsel can only be understood in terms of what was still available to him after the immunity was granted; per the terms of the order, this was cross-examination only on the accuracy of the transcript of Baca's statement, not on its substance.

**{46}** The little that was at stake for Defendant during the back-and-forth about how to proceed with Baca's statement after the order was granted is evident from the court's statement to defense counsel that foregoing cross-examination "might be a substitute for having Mr. Baca basically sit on the stand and affirm the statement and sit on the stand and answer to you that he is going to assert the Fifth." If Defendant can be said to have waived anything in negotiating with the State, he may have waived the limited cross-examination still permitted to him after the order was granted, specifically cross-examination limited to the accuracy of the transcript. The constitutional error was made at the point that the State's motion was granted: any subsequent negotiation with respect to cross-examination of Baca on his verification of the statement did not waive the objection to the underlying, fundamental limitation on Defendant's rights to fully cross-examine Baca on the substance of the statement.

**{47}** Although defense counsel participated in the discussion about how best to handle Baca's statement and, in so doing, stipulated to admission of the statement and said that he waived cross-examination, his *Crawford* argument had been made and rejected by that point. Participating in the discussion "in light of the rulings made" did not constitute a "knowing and voluntary" waiver of the prior *Crawford* objection. *See Padilla*, 2002-NMSC-016, ¶ 18. We particularly decline to imply a waiver in light of defense counsel's clear statement: "I am not waiving *Crawford* . . . and I don't intend to."

**{48}** The State next contends that defense counsel waived his objection to the *Crawford* issue by failing to ask any questions of Baca after the State had put him on the stand to verify the transcript of his statement. We emphasize that, as discussed above, Baca was only on the stand for the limited purpose of verifying the accuracy of the transcript of his statement and was not available to answer substantive questions. All parties and the court were aware that outside the bounds of the immunity order, Baca had invoked the Fifth Amendment. Requiring defense counsel to attempt to question Baca on the substance of his statement to

avoid waiving his *Crawford* objection would have resulted in Baca invoking the Fifth Amendment on the stand. However, to avoid prejudice, claims of privilege are to be invoked outside the presence of the jury. Rule 11-513(B) NMRA. Requiring defense counsel to attempt to cross-examine Baca when he was aware that Baca had invoked the Fifth Amendment would have been improper; Defendant did not waive *Crawford* by declining to do so.

**{49}** Finally, the State and the dissent maintain that Defendant waived his right to cross-examine Baca and actually acquiesced in admission of the statement for strategic reasons, as demonstrated by his subsequent reliance on Baca's statement. While we agree that admission of the statement may have been beneficial to Defendant because of Baca's claim that the occupants of the Explorer were the only ones to fire a gun, we remain unpersuaded that the possible benefit to Defendant betrays a tactical or strategic plan on the part of defense counsel to "have it both ways," specifically to object to the statement to preserve an appellate claim and yet to acquiesce in its admission to buttress his client's defense in front of the jury. On the whole, defense counsel fought admission of Baca's statement because it provided strong evidence of a possible motive and was foundational evidence for the State to introduce a gang expert who testified to extensive detail on gangs and gang rivalries and may have diminished Defendant in the eyes of the jury. Defendant's subsequent reliance on the statement was not a waiver or evidence of a strategic plan to have it both ways, but was an attempt to mitigate the adverse ruling by arguing the evidence in his client's favor.

**{50}** Defense counsel's reliance on Baca's statement after his *Crawford* objections had been made and rejected did not constitute a waiver. An objection is not waived where, after it is overruled, the objecting party agrees to the introduction of statements similarly objectionable and relies on them to make its case. *Sayner v. Sholer*, 77 N.M. 579, 581, 425 P.2d 743, 744 (1967) ("The court having already overruled the proper objection . . . , counsel was placed in the rather unenviable position of having to make the best of a bad situation. This was not a waiver." (internal quotation marks and citation omitted)); *accord Romero*, 2006-NMCA-045, ¶ 16 (holding that, where "improper evidence is admitted over objection, resort may be had to like evidence without waiving the original error." (internal quotation marks and citation omitted)); 1 John W. Strong, *McCormick on Evidence* § 55, at 246-47 (5th ed. 1999) (same). Arguing evidence admitted over an attorney's objection in the client's favor is consonant with an attorney's professional responsibility to zealously advocate for the client and the attorney's duty to act diligently under Rule 16-103 NMRA. There is no waiver where a defense attorney, his or her original objection rejected by the court, determines to "make the best of a bad situation" and argues the improperly admitted evidence in the client's favor. *See Sayner*, 77 N.M. at 581, 425 P.2d at 744.

**{51}** For all the foregoing reasons, we conclude that Defendant did not waive his *Crawford* objection.

**D.** **Admission of Baca's Statement Was Not Harmless Error**

13

**{52}** When a statement is admitted in violation of the Confrontation Clause, we next inquire into whether the error was harmless. *Delaware v. Van Arsdall*, 475 U.S. 673, 682 (1986); *Johnson*, 2004-NMSC-029, ¶ 7. To preclude reversal, the error must be harmless beyond a reasonable doubt. *Johnson*, 2004-NMSC-029, ¶ 8. The ultimate inquiry is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman v. California*, 386 U.S. 18, 23 (1967) (internal quotation marks and citation omitted). We do not "cobble together sufficient evidence" and proclaim that the jury might have convicted the defendant in the absence of the erroneously admitted statement, *see Johnson*, 2004-NMSC-029, ¶ 44, nor do we usurp the role of the jury and conduct our own inquiry into the defendant's guilt or innocence. *See id.* ¶ 43. Rather, we make "an objective reconstruction of the record of evidence the jury either heard or should have heard absent the error and a careful examination of the error's possible impact on that evidence." *Id.* ¶ 10.

**{53}** In conducting a harmless error analysis in the context of a *Crawford* violation, we are guided by the following "Johnson factors:" (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. *Id.* ¶ 11. "Once the constitutional error has been established, the burden is on the State to demonstrate the error is harmless beyond a reasonable doubt." *Id.* ¶ 9.

**{54}** All of Defendant's convictions arose from his alleged shooting at the Explorer and all of them required the jury to discredit his claim of self-defense. Thus, while there are some cases where an error may not be harmless with respect to one conviction and harmless with respect to another conviction, *id.* ¶ 31, we are presented with a case where Defendant's convictions will either all stand together or all fall together. This will depend on whether there was a "reasonable possibility" that Baca's statement might have contributed to the jury's conclusion that Defendant had not acted in self-defense. *See Chapman*, 386 U.S. at 23.

**{55}** The first Johnson factor requires us to examine the importance of Baca's statement to the State's case. We begin by noting that the State mentioned Baca's statement eight times in its closing argument. The State argued that Baca's statement proved that Defendant had not acted in self-defense and was in fact the first shooter. In making this point, the State recounted to the jury that Baca saw the occupants of the Explorer hanging out of the car, did not see any weapons, and then heard shooting. The State claimed that this proved that the shots that Baca heard came not from the occupants of the Explorer, whom Baca did not see wielding a gun, but from Defendant.

**{56}** The State also relied on Baca's statement that he and Defendant recognized the occupants of the Explorer as members of TCK, a gang whom they had had trouble with, and that there was yelling and flashing of gang signs before the shooting broke out. The State

14

represented multiple times to the jury that this tended to show Defendant's intent to confront the occupants of the Explorer and that he was not merely protecting himself when he shot at them.

**{57}** While we acknowledge that Baca's statement also supported Defendant's claim that the occupants of the Explorer were the first to fire, and that the portion of Baca's statement relied upon by the State does not seem to be particularly strong proof that Defendant was the initial shooter, we do not weigh evidence. What is paramount in the Johnson analysis is the State's heavy emphasis on Baca's statement and its continuous representations to the jury that the statement disproved Defendant's claim of self-defense. *See State v. Torres*, 1999-NMSC-010, ¶ 53, 127 N.M. 20, 976 P.2d 20 (holding that the State's emphasis on improperly admitted evidence demonstrated a reasonable possibility of it contributing to the conviction). Because of the State's heavy reliance on Baca's statement, the first Johnson factor weighs in favor of a "reasonable possibility" that its admission contributed to Defendant's conviction. *See Chapman*, 386 U.S. at 23.

**{58}** The second Johnson factor is whether the improperly admitted statement was merely cumulative. In addressing this factor, we treat Baca's statement as containing two strands of evidence. First, as discussed above, the State used portions of Baca's statement to argue that Defendant had not acted in self-defense but was the initial shooter. The State also utilized the statement for Baca's admission that the shooting arose because of a gang rivalry. On neither point was the statement cumulative.

**{59}** First, although the statement was not the only evidence that Defendant had not acted in self-defense when he allegedly shot at the Explorer, it was the only evidence of its kind on this point. Specifically, it was the only evidence originating directly from an occupant of the Saturn that incriminated Defendant. Given that Baca's self-inculpating admission would be much more powerful in the eyes of the jury than what could be perceived as the self-serving claims by the surviving occupants of the Explorer, Baca's statement was not cumulative. Rather, it corroborated and confirmed the victims' testimony that Defendant was the initial shooter. *See Johnson*, 2004-NMSC-029, ¶ 39 ("[C]orroborative evidence tends to corroborate or to confirm, whereas cumulative evidence merely augments or tends to establish a point already proved . . . .").

**{60}** The State also used Baca's statement to show that the shooting arose because of a gang rivalry. The statement was not cumulative on this point, either. Both of the surviving occupants of the Explorer initially denied the possibility that the shooting was gang-related, although one of them subsequently admitted at trial that the shooting might have been gang-related. Thus, there was little direct evidence beyond Baca's statement that the shooting arose because of a gang rivalry.

**{61}** The introduction of the gang element was significant for two reasons. First, it provided evidence of a motive for the shooting. Second, it created the foundation for the State to introduce expert evidence on Los Padillas and TCK, the gangs' particular rivalry,

15

and how the initial encounter may have escalated into a shooting match. We cannot conclude that introduction of Baca's statement, with its injection of gangs into the trial, was "so unimportant and insignificant" that it did not affect the verdict. *See Chapman*, 386 U.S. at 22.

**{62}** As to the third Johnson factor, although Baca's statement may not have been the only evidence tending to show that Defendant was the initial aggressor or that gangs were involved in the shooting, it was the strongest. As discussed above, it was particularly damaging to Defendant in that it came from his accomplice. Regarding the fourth Johnson factor, as analyzed in detail above, there was no cross-examination of Baca permitted outside of his verification of the statement. Cross-examination of other witnesses was unrestricted.

**{63}** The final Johnson factor requires inquiry into the overall strength of the State's case against Defendant. While the prosecution's case was quite strong that Defendant shot at the Explorer—there was substantial evidence that occupants of the two cars shot at one another—it was less strong that he did not act in self-defense because there was no conclusive evidence showing who fired the first shots. However, our role is not to ask "whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.* ¶ 9 (internal quotation marks and citation omitted). To this effect, we decline to "hypothesize a guilty verdict that was never in fact rendered." *See Johnson*, 2004-NMSC-029, ¶ 10 (internal quotation marks and citation omitted). We cannot conclude that the same verdict would have been returned for Defendant in the absence of Baca's statement.

**{64}** For all the forgoing reasons, Baca's statement was not "so unimportant and insignificant" that there was no "reasonable possibility" that it contributed to the verdict against Defendant. *See Chapman*, 386 U.S. at 22, 23. The admission of Baca's statement was not harmless error.

## III.    CONCLUSION

**{65}** Admission of Baca's statement in the absence of any opportunity for Defendant to cross-examine Baca on its substance violated Defendant's Sixth Amendment rights under *Crawford* and was not harmless error. Defendant's convictions are vacated and we remand for a new trial consistent with this Opinion.

**{66}    IT IS SO ORDERED.**

_____
**PATRICIO M. SERNA, Justice**

**WE CONCUR:**

16

**RICHARD C. BOSSON, Justice**

**CHARLES W. DANIELS, Justice**

**CHÁVEZ, Chief Justice (dissenting).**

**{67}** Defendant knowingly and voluntarily waived his right to cross-examine witness Ray Baca (Baca). Baca's statement was not admitted in lieu of live testimony except at Defendant's prompting, and as such, I respectfully dissent.

**{68}** The State produced Baca to testify with the benefit of use immunity. The parameters of the use immunity were defined by the contents of a statement given by Baca to an investigating officer on the night of the shooting in question. The State intended to introduce the statement's substance through directly questioning Baca, without restricting Defendant from cross-examining him about the statement. Instead of exercising the right to cross-examine Baca concerning the statement, Defendant's attorney announced his preference for the entire transcript of the statement to go to the jury. Obviously, this strategic decision was prompted by the exculpatory evidence in the statement. As such, I agree with the State's unrebutted argument that Defendant waived any potential claim under *Crawford v. Washington*, 541 U.S. 365 (2004) relating to Baca's statement. I would affirm the trial court on this issue and I am not persuaded by Defendant's remaining arguments. Therefore, I would affirm his convictions.

**{69}** The dispute over Baca's statement originated before trial in Defendant's efforts to prevent the State from introducing evidence that the killing had been gang-related. Defendant argued that there was no foundation for such evidence, but the trial court agreed with the prosecutor that testimony from Baca, along with other foundational testimony, would justify its introduction. Defendant filed a motion to reconsider this judgment, and by the time a hearing was held on the motion, Defendant had been apprised that Baca would refuse to testify to avoid self-incrimination. Baca had previously been convicted of crimes relating to this shooting, and was currently appealing his conviction. Defendant argued that if Baca would not testify, the prosecutor could not introduce his statement at trial because this would violate Defendant's rights under *Crawford*. 541 U.S. at 59. The prosecutor answered that she planned to offer limited use immunity to Baca. Defendant raised no further concerns.

**{70}** Having concluded its discussion of Defendant's motion to reconsider, the trial court went on to discuss a separate defense motion in limine, the text of which is unavailable to us, in which Defendant apparently sought to disqualify the jury panel. Defendant argued that the jury had been unfairly prejudiced because its questionnaires

included details about gangs. Defendant argued that since Baca would not be testifying, the jury would not actually hear evidence at trial about gangs, because introducing the statement without the opportunity to cross-examine would violate *Crawford*. The prosecutor again explained that

> [I]n terms of Crawford, [defense counsel] is correct. If Mr. Baca takes the stand, refuses to testify, although that makes him unavailable as a witness, his statement to [the police] was testimonial. I would not be able to walk up and admit it, and I had not intended to do that. Instead . . . [I am seeking] an order compelling testimony and granting use immunity. . . .

Once again, Defendant had no response; he never argued before trial that the grant of limited use immunity would not satisfy his need to cross-examine Baca.

**{71}** As the prosecutor indicated, Baca was present in court during trial, and the prosecution was prepared to call him as a witness. Based on discussions the prosecutor had with Baca's attorney, she confirmed that Baca intended to invoke his Fifth Amendment privilege. The trial court asked the prosecutor, "[w]hat are you going to be asking of Mr. Baca at this time?" The prosecutor responded that she would seek to compel his testimony, having granted him use immunity for testimony relating to his statement. The prosecutor elaborated:

> I would ask him if he recalled the interview, did he recall being mirandized or not, and asking very specific questions about what he told her. Where he was, who he was with. What car he was driving. They encountered a black truck. When the black truck turned on Churchill his interview states that they began firing at the Saturn with a weapon, and I believe his statement also says he yelled at them "f--- you," I believe it was, and at that point he was shot in the hand.

While on the witness stand, Baca asked the trial court about the penalty for contempt of court. Apparently unsure, the trial court asked counsel to comment. The prosecutor indicated that the penalty could be up to a year. Defendant's attorney made a vague reference to a pretrial motion regarding *Crawford* and his inability to cross-examine Baca, which from his perspective led to the State's legal position, apparently referring to the grant of use immunity.

**{72}** After being satisfied that Baca would invoke his Fifth Amendment privilege, the trial court turned to the issue of use immunity. The prosecutor argued that it would be in the interest of justice if Baca were compelled to testify about his statement to the police, noting that it contained evidence favorable to Defendant. Defendant's attorney stated that he reiterated his arguments prior to trial "regarding the Crawford problems":

> We reiterate our arguments, Judge, made prior to the trial beginning

18

regarding the Crawford problems. We still feel there's some restriction if the testimony is permitted without the opportunity to fully cross-examine him. We realize the State is attempting to obviate that by seeking the motion, the granting of the motion, which would then make it a fifth amendment problem. But we do not concur in the motion. We still want to be able to fully cross-examine the gentleman if he testifies at all, but we realize that there are certain limitations. The State may have successfully but we are in opposition because we feel it's too restrictive in cross-examination.

This was the only discussion to which Defendant cited in his brief in chief as evidence that he preserved the *Crawford* issue. Defendant did not point this Court to the discussion he was reiterating, and although I have scoured the record, I have been unable to find any prior discussion relevant to this topic. This explanation was nothing more than an unilluminating repetition of Defendant's pretrial assertion, to which the prosecutor had agreed, that he was entitled to cross-examine Baca about the statement he gave to the police. Importantly, no one contended that Defendant's attorney could not cross-examine Baca about the statement. This simply was not a situation where the statement itself was being tendered in lieu of live testimony. Baca was in the courtroom and the trial court was considering whether to compel him to answer the questions the prosecutor intended to ask.

**{73}** In any event, Baca opposed use immunity because he did not believe that his testimony was relevant. The prosecutor rebutted this argument by pointing out that Baca was one of the few witnesses who was directly involved in the incident. Significantly, Defendant's attorney agreed that the testimony would be relevant. After taking a recess to consult case law, the trial court announced that Baca's statement was relevant to the case and then granted Baca use immunity.

**{74}** After the trial court announced its decision, Baca's attorney asked if the prosecutor could simply inquire whether Baca made the statement. The prosecutor explained her preference for asking questions, not just admitting the statement:

> So what I would prefer to do is let him go over the statement, even keep a copy with him, and then basically just walk through it and say, "Did you talk to Mary Ann Wallace," in a semi-leading way, "on this date? Did she mirandize you, give you rights? Did you waive the rights?"
>
> "Yes, I did.["]
>
> "Did you tell her what happened that day?["]
>
> "Yes, I did."

19

"And can you tell us who you were with," which is in the statement, and not go outside of asking him anything that is not in the statement, but basically allowing him to answer instead of me feeding him the answers.

Defendant's attorney then asked the trial court whether the transcript would go to the jury. The trial judge indicated that he did not know. While the prosecutor was explaining how she would question the witness, the court apparently asked Defendant's attorney, "[w]ell, you want the transcript?" Defendant's attorney explained that he did want the transcript to go to the jury:

I think I do want it. If we are going to get into it, I think the whole thing has to go in. I think the transcript is an accurate transcription, but it seems consistent, and I certainly can't get anything better off my hearing of the actual tape, so I figure if we will be asking questions, it does capture the excitement, much of the 911 transcript does, of the young men that were, at one point or another, in both vehicles. So I think that would move matters along better. We wouldn't have to walk him through, "Did you say this, did you say that." If it goes in, what is exciting or meaningful is the manner in which it's said. I think as [the State] said, it does help us in the search for truth.

Baca's attorney then interjected that he was still concerned because the prosecution seemed to want to ask questions such as "[i]s this what happened that night," instead of questions about the statement. Defendant's attorney then interjected his perspective that it would be less prejudicial to the defense if the statement were introduced with Baca acknowledging its contents, given the trial court's rulings. What rulings were alluded to by Defendant's attorney are unclear, since the only ruling at this point was that use immunity would be granted to Baca, and that Baca would be compelled to testify about the contents of his statement to the police. The mechanics for getting the information before the jury remained at issue. The State wanted the standard question-and-answer format, but Baca's attorney and Defendant's attorney wanted the statement transcript admitted instead.

**{75}** The prosecutor explained that she did not object to stipulating to the transcript, but astutely inquired "[b]y merely stipulating to the transcript, my next question would be is he then waiving, essentially waiving, his right to cross-examine Mr. Baca by stipulating to the transcript being admitted?" The prosecutor clearly recognized that admitting the statement without cross-examination could raise doubts about whether the *Crawford* problem had truly been solved. If Defendant wanted the statement admitted, the prosecutor was demanding that he specify that he was voluntarily foregoing cross-examination.

**{76}** Unsure of what Defendant was thinking, the trial court turned to Defendant's

20

attorney for clarification. Defendant's attorney said that Defendant was not waiving his argument based on *Crawford,* although yet again Defendant has not pointed this Court to the argument on which he relies, and none is evident from a review of the record. Because Defendant was not waiving his right to cross-examine Baca, the prosecution pointed out that it could not "merely stipulate to the statement." The trial court agreed. The prosecutor then went on to state, "[i]n those terms, I would have to have Mr. Baca testify as to what he said and allow Mr. Samore to cross-examine him on that testimony, whatever the questions may be. And obviously, if he got outside of what Mr. Baca testified, then he has a fifth amendment privilege."

{77}   This exchange confirms that the State was not restricting Defendant's right to cross-examine Baca about the statement. This is simply not a *Crawford* violation.[2] "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. . . . The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford*, 541 U.S. at 59. As the majority points out, *Crawford* protects the right to cross-examine on the statement. Majority Opinion, ¶ 28.

{78}   Defendant's attorney, recognizing that the State would be unwilling to simply admit the statement as evidence without a waiver, quickly made an interjection to find out what the trial court was suggesting by "waiving any cross-examination at this point in the proceedings we could put the statement in and both sides would waive cross?" When the trial court verified that this was indeed what it was thinking, Defendant's attorney stated unequivocally, "[w]e would be willing to do that."

{79}   Although I conclude that this was enough to show that Defendant waived his right to cross-examine Baca about the statement, the trial court exercised greater caution. After Defendant's attorney indicated that he might want to ask Baca to verify a picture of Baca's injured hand, the trial court asked, "Do you agree that would satisfy your need to cross?" Defendant's attorney flatly stated, "[y]es, judge." Leaving nothing to chance, the trial court went on to ask, "Mr. Samore, I want to be sure on the record that you are comfortable at this point asking that the sole question that you would ask, or that you will be asking of Mr. Baca about this and agreeing to waive further cross?" "At this point I am[,]" replied Defendant's attorney, although he cautioned that questions made by the prosecution might require him to ask more questions, in which case he would approach the bench before doing so.

{80}   With this agreement on the record, the jury returned to open court and Baca testified. After Baca identified the statement he made to the investigating officer, the

---

[1]If Defendant's concern was the limited scope of Baca's use immunity, he should have alerted the trial court to this concern with something more than a vague reference to a right to "fully cross-examine."

21

prosecutor announced, "Your Honor, the parties have stipulated to the admission of State's Exhibit 123 which is the transcript of Mr. Baca's statement, as given to Detective Mary Ann Wallace on April 16, 2004." Defendant's attorney noted his concurrence and Defendant's concurrence and chose not to ask Baca any questions.

**{81}** Because Baca's statement was not admitted in lieu of live testimony except with Defendant's prompting, I would find that Defendant waived his right to cross-examine Baca about the statement. Had Defendant not sought to have the transcript introduced, it is clear from the record that his attorney could have cross-examined Baca about the statement. The Confrontation Clause does not require more, and as such I must respectfully dissent.

_____
**EDWARD L. CHÁVEZ, Chief Justice**

**I CONCUR:**

_____
**PETRA JIMENEZ MAES, Justice**

**TOPIC INDEX FOR *STATE V. ZAMARRIPA*, NO. 30,210**

**Appeal and Error**
AE-PA:      Preservation of Issues for Appeal

**Constitutional Law**
CT-CT:      Confrontation
CT-PS:      Prior Statement
CT-SI:      Self-incrimination
CT-WR:      Waiver of Rights

**Evidence**
EV-AE:      Admissibility of Evidence
EV-AV:      Availability of Witness
EV-WI:      Witness Immunity