IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:** _____

**Filing Date:   June 20, 2016**

**NO. 34,042**


**STATE OF NEW MEXICO**,

      Plaintiff-Appellee,

v.

**TRUETT THOMAS,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Samuel L. Winder, District Judge**

Jorge A. Alvarado, Chief Public Defender
Karl Erich Martell, Assistant Appellate Defender
Santa Fe, NM

for Appellant


Hector H. Balderas, Attorney General
M. Victoria Wilson, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**DANIELS, Chief Justice.**

{1}     The Sixth Amendment to the United States Constitution and Article II, Section 14 of the New Mexico Constitution guarantee a criminal defendant the right to confront adverse witnesses. Defendant Truett Thomas appeals from his convictions of first-degree deliberate murder and first-degree kidnapping on multiple grounds, including an asserted violation of the Confrontation Clause through the admission of two-way video testimony of a prosecution witness. We reverse Defendant's convictions on this basis but remand for a new trial on the murder charge only, having concluded that there was insufficient evidence to support the kidnapping conviction. Although we need not decide whether social media posts by the district court judge about the case before him also would have required reversal, we caution judges to avoid both impropriety and its appearance in their use of social media.

**I.     BACKGROUND**

{2}     On June 3, 2010, Guadalupe Ashford's body was found partially hidden behind a trash can at the edge of a small parking lot. Drag marks and blood spatter indicated that Ashford had initially been assaulted in the lot and then dragged a short distance to its edge where her body was found. The drag marks were contained within the span of one parking space and extended less than ten feet. Ashford's body had significant

head injuries, including lacerations, skull fractures, and a dislodged tooth. The medical investigator determined that Ashford died from blunt force injuries to her head, but he could not identify which of the several injuries was the cause and could not calculate a specific time of death. Police testimony indicated that there were no known witnesses to the assault and that no one reported seeing Defendant in the area.

{3}	An Albuquerque Police Department (APD) forensic scientist analyst performed DNA measurements of samples collected from Ashford's body and from a six-inch by six-inch bloodied brick described as "paver stone" and believed to be the murder weapon, generating DNA profiles of Ashford and of the presumed perpetrator. Unidentified DNA was also discovered on the paver stone, though in smaller amounts than the DNA evidence matching either of the full profiles. The forensic analyst entered the presumed perpetrator's profile into the CODIS database, which resulted in a match to Defendant. "Authorized by Congress and supervised by the Federal Bureau of Investigation, the Combined DNA Index System (CODIS) connects DNA laboratories at the local, state, and national level . . . [and] collects DNA profiles provided by local laboratories taken from arrestees, convicted offenders, and forensic evidence found at crime scenes." *Maryland v. King*, __ U.S. __, ___, 133 S. Ct. 1958, 1968 (2013). Defendant was arrested and charged on the basis of this DNA evidence,

but he denied ever having met Ashford.

{4}     Defendant was held in pretrial custody for twenty-two months before he moved to dismiss the charges for violation of his right to a speedy trial. The district court denied the motion and set the trial to begin approximately twenty-six months after Defendant's arrest.

{5}     By the time the case came to trial, the State's forensic analyst had moved out of New Mexico. At a hearing two weeks before trial, the prosecutor expressed concerns about securing the presence of that forensic analyst at trial and suggested that she be allowed to testify over the live, two-way audio-video communications application Skype as an alternative. *See State v. Schwartz*, 2014-NMCA-066, ¶ 5, 327 P.3d 1108 (describing Skype as "an Internet software application[] that . . . allow[s] users to engage in real time video and audio communications between two or more locations" (alterations and omission in original) (internal quotation marks and citation omitted)). When the court asked about defense counsel's "thoughts with regard to Skype," counsel, who had previously interviewed the witness through Skype, responded,

> I don't like it, but I think it will work. . . . It's just weird. She's
> really just going to be there to establish the chain of custody, so she's
> not—I mean, she's important, obviously, for the State, but she's not too
> important. I don't really have a problem with Skyping it, as long as

there's no technical issues.

If there's technical difficulties, then they're not going to be able to establish the chain of custody. Then it's game over.

At another pretrial hearing in the following week, the court asked if there were "any other matters" that needed to be addressed before trial. In response, defense counsel expressed hesitation at the use of Skype testimony, stating,

We are going to do the research on this. I don't think we have enough research on the Skype issue[,] . . . and we have rethought our position on that, and we're thinking it's going to cause a confrontation problem.

The prosecutor replied that the State had not sought an enforceable subpoena for the witness in reliance on defense counsel's statement a week earlier that Skype would "work." The district court judge took the position that Defendant had waived any objection to the use of two-way video by defense counsel's initial informal acquiescence.

{6}     At trial seven days later, the State called the absent forensic analyst to testify via Skype. During her testimony, a computer image of the forensic analyst faced the jury, but she was able to see only an image of the attorney questioning her and could not see Defendant, the jury, or the district court judge at any time. A second APD forensic scientist analyst did testify in person for the State. She had reviewed and interpreted the measurements performed by the forensic analyst who testified by

4

Skype but had not performed any of the DNA measurements herself.

{7} The jury found Defendant guilty of first-degree murder and first-degree kidnapping. The district court imposed consecutive sentences of life imprisonment for the murder and eighteen years for the kidnapping. Defendant moved for a new trial based on additional DNA evidence developed after trial that, according to Defendant's argument, suggested that one or more other individuals could have had contact with Ashford or with the murder weapon.

{8} At the hearing on that motion, before a successor district court judge, Defendant also raised the issue of social media posts made by the original district court judge during the pendency of the trial. The posts, made on a Facebook page used for the unsuccessful election campaign of the original district court judge, discussed Defendant's case. During trial, the district court judge had posted, "I am on the third day of presiding over my 'first' first-degree murder trial as a judge." After trial, but before sentencing, the district court judge posted, "In the trial I presided over, the jury returned guilty verdicts for first-degree murder and kidnapping just after lunch. Justice was served. Thank you for your prayers." The district court denied the motion for a new trial, and Defendant appealed his convictions directly to this Court pursuant to the New Mexico Constitution. *See* art. VI, § 2 ("Appeals from a

5

judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court.").

## II. DISCUSSION

### A. Defendant's Right to a Speedy Trial Was Not Violated

{9} We first address Defendant's argument that his twenty-six months of pretrial custody violated his constitutional right to a speedy trial. *See* U.S. Const. amend. VI (guaranteeing a speedy trial "[i]n all criminal prosecutions"); N.M. Const. art. II, § 14 (same). The Due Process Clause of the Fourteenth Amendment applies the Sixth Amendment speedy trial right to state prosecutions. *Klopfer v. North Carolina*, 386 U.S. 213, 222-23 (1967). Because Defendant makes no claim that his rights under the New Mexico Constitution should be interpreted more broadly than those guaranteed by the Fourteenth Amendment of the United States Constitution, "we base our discussion of this issue on the constitutional requirements established under federal law." *State v. Coffin*, 1999-NMSC-038, ¶ 54 n.2, 128 N.M. 192, 991 P.2d 477.

{10} Pretrial delay may trigger a speedy trial inquiry but is not alone determinative of a constitutional violation. *State v. Samora*, 2013-NMSC-038, ¶ 24, 307 P.3d 328. Instead, in accordance with the federal constitutional guidelines established by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972), we must

review the individual circumstances of the case, including the conduct of both prosecution and defense, and the actual harm that a defendant may have suffered as a result of pretrial delay. *State v. Garza*, 2009-NMSC-038, ¶ 13, 146 N.M. 499, 212 P.3d 387. Factors in this analysis are (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of his right, and (4) the actual prejudice to the defendant incurred from the delay. *Barker*, 407 U.S. at 530. "Each of these factors is weighed either in favor of or against the State or the defendant, and then balanced to determine if a defendant's right to a speedy trial was violated." *State v. Spearman*, 2012-NMSC-023, ¶ 17, 283 P.3d 272. While we give deference to the factual findings of a trial court in performing this analysis, we review the application of the factors de novo. *Id* ¶ 19.

{11}    The district court found that this was a complex case due to the required DNA analysis and the average time required to process a homicide case in the jurisdiction, and the parties do not dispute that finding. Because a "trial court [is] familiar with the factual circumstances, the contested issues and available evidence, the local judicial machinery, and reasonable expectations for the discharge of law enforcement and prosecutorial responsibilities," we defer to the district court's finding on the question of complexity when that "finding[] . . . [is] supported by substantial evidence." *State*

7

*v. Manzanares*, 1996-NMSC-028, ¶ 9, 121 N.M. 798, 918 P.2d 714.

{12}    The delay in this case was sufficient to trigger a speedy trial inquiry, *see Garza*, 2009-NMSC-038, ¶¶ 47-48 (stating that a delay of over eighteen months is sufficient to trigger an inquiry in a complex case), but it was not sufficiently beyond the guideline that may trigger further inquiry that it would weigh heavily against continuation of the prosecution. *See id.* ¶¶ 23-24 (stating that "the greater the delay the more heavily it will potentially weigh against the State," and concluding that a ten-month delay in a simple case "scarcely crosse[d] the bare minimum [of nine months] needed to trigger judicial examination" and was not so extraordinary that it would weigh heavily (internal quotation marks and citation omitted)); *State v. Montoya*, 2011-NMCA-074, ¶ 17, 150 N.M. 415, 259 P.3d 820 (stating that a delay of six months beyond the presumptive period weighed only slightly against the State). Much of the delay here was administrative, due to a vacancy on the bench and due to the unavailability to the defense of the forensic analyst for pretrial interviews. Although this type of delay is characterized as negligent and weighs against the State, it does not weigh heavily where, as here, there is no evidence of bad-faith intent to cause delay. *Garza*, 2009-NMSC-038, ¶¶ 25-26.

{13}    Defendant asserted his right to a speedy trial when his counsel filed an entry

8

of appearance one month after his arrest and then again twenty-one months later in a motion to dismiss. We assess the timing and manner of Defendant's assertions and give weight to the frequency and force of his objections. *Id.* ¶ 32. Defendant here initially asserted his speedy trial right in a pro forma manner but made no focused assertion until almost two years had passed. This history weighs only slightly in his favor. *See id.* ¶ 34 (weighing a speedy trial demand slightly in favor of a defendant who asserted the right once, and not vigorously, before filing a motion to dismiss); *State v. Urban*, 2004-NMSC-007, ¶ 16, 135 N.M. 279, 87 P.3d 1061 (stating that pro forma pretrial motions filed upon counsel's entry of appearance are generally afforded relatively little weight in the analysis of a claimed violation of the right to a speedy trial).

{14}    Concerning the fourth *Barker* factor, "generally a defendant must show particularized prejudice of the kind against which the speedy trial right is intended to protect." *Garza*, 2009-NMSC-038, ¶ 39. The first three *Barker* factors all weigh slightly in Defendant's favor, but "only where the length of delay and the reasons for the delay weigh heavily in [a] defendant's favor and [the] defendant has asserted his right and not acquiesced to the delay [does] the defendant need not show [particularized] prejudice in order to prevail on a speedy trial claim." *Samora*, 2013-

9

NMSC-038, ¶ 27 (fourth alteration in original) (internal quotation marks and citation omitted). In analyzing prejudice, we consider a defendant's interests in (1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern, and (3) limiting the possibility that the defense will be impaired. *Garza*, 2009-NMSC-038, ¶ 35. "The burden of showing all types of prejudice lies with the individual claiming the violation[,] and the mere 'possibility of prejudice is not sufficient to support [the] position that . . . speedy trial rights [are] violated.'" *Id.* (second and third alterations and omission in original) (quoting *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986)).

{15} Defendant argued in the district court that pretrial incarceration had caused him to suffer from depression and to lose his ability to work and survive on the streets, had diminished his social skills so that he might not be able to assist in his own defense, and might cause witness memories to fade before trial. Because the effects of pretrial incarceration are experienced by every jailed defendant awaiting trial, we weigh this factor in the defendant's favor only where the pretrial incarceration or the anxiety suffered is "undue." *Id.* ¶ 35; *see* Black's Law Dictionary 1759 (10th ed. 2014) ("undue" is "[e]xcessive or unwarranted").

{16} On appeal, Defendant makes no argument as to why his anxiety was beyond

that generally suffered by incarcerated defendants, nor does he point to any evidence indicating that he was unable to assist in his own defense in any way, that any witnesses were unable to remember any information needed for his defense, or that he was impaired in his defense in any other demonstrable manner as a result of the time that elapsed before he was brought to trial. "[W]ithout a particularized showing of prejudice, we will not speculate as to the impact of pretrial incarceration on a defendant or the degree of anxiety a defendant suffers." *Garza*, 2009-NMSC-038, ¶ 35. Because the other factors do not weigh heavily in his favor, and because Defendant has failed to demonstrate any particularized prejudice, we conclude that Defendant's speedy trial claim does not call for reversal of his convictions.

**B.      The Skype Testimony Violated the Confrontation Clause**

{17}      The Confrontation Clause of the Sixth Amendment to the United States Constitution, like its counterpart in the New Mexico Constitution, provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *See* U.S. Const. amend. VI; N.M. Const. art. II, § 14. Under this Court's interstitial mode of constitutional analysis, we first consider whether the United States Constitution provides Defendant relief before determining whether it is necessary to address a counterpart protection under the New Mexico Constitution.

11

*See State v. Lopez*, 2013-NMSC-047, ¶ 8, 314 P.3d 236 (noting that where an asserted right is protected by the United States Constitution, there is no need to reach the counterpart State constitutional claim). "[Q]uestions of admissibility under the Confrontation Clause are questions of law, which we review de novo." *State v. Montoya*, 2014-NMSC-032, ¶ 16, 333 P.3d 935 (internal quotation marks and citation omitted).

**1.     Defendant did not knowingly and voluntarily waive his right to object to violation of his right to confrontation**

{**18**}     As an initial matter, the State argues that Defendant waived his right to raise the issue of violation of his confrontation rights. A fundamental right, even a constitutional right, may be waived. *State v. Padilla*, 2002-NMSC-016, ¶ 12, 132 N.M. 247, 46 P.3d 1247. "Waiver is the intentional relinquishment or abandonment of a known right or privilege." *State v. Zamarripa*, 2009-NMSC-001, ¶ 38, 145 N.M. 402, 199 P.3d 846 (internal quotation marks and citation omitted). But "[t]here is a presumption against the waiver of constitutional rights." *Id.* To be valid, waivers "must be voluntary[,] . . . knowing, [and] intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Padilla*, 2002-NMSC-016, ¶ 18 (internal quotation marks and citation omitted). This Court reviews de novo whether a waiver was knowing and voluntary, considering the facts and

circumstances of the case. *Id.*

{19} The district court judge apparently accepted that Defendant had waived his right to object to violation of his confrontation rights when defense counsel initially acquiesced to the admission of two-way video testimony, seemingly based on counsel's stated belief that the witness would only establish the chain of custody for the DNA evidence. A week later and just one week before trial, defense counsel had more thoroughly considered the issue and asserted that the video testimony would violate Defendant's right to confrontation. The district court judge refused a continuance and advised defense counsel to "note [his] objections on confrontation grounds." Later, the district court judge stated that he believed the right to object had been waived, but at no time did either the district court or defense counsel discuss any permanent waiver of confrontation rights with Defendant directly.

{20} "The duty to protect fundamental rights 'imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused.'" *Id.* ¶ 19 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938)). Although no particular form is required, it is the court's obligation to make sure that a waiver is valid and predicated upon a meaningful decision by the defendant. *Padilla*, 2002-NMSC-016, ¶ 19. "[T]here must be a sufficient colloquy to

satisfy the trial court's responsibilities; a knowing and voluntary waiver cannot be inferred from a silent record." *Id.* With no discussion in the record between the district court and Defendant concerning his confrontation rights, there is no evidence that Defendant understood those rights or that he voluntarily agreed to waive them, and we must conclude that no intentional waiver occurred.

{21}    The State also argues that defense counsel should be deemed to have permanently waived his client's confrontation rights because counsel's "prior waiver of [the out-of-state witness's] physical presence at trial caused her unavailability." But the State points to nothing in the record indicating that the one-week period between defense counsel's initial acquiescence and his reconsideration and objection had anything to do with the State's failure to invoke the complex and time-consuming procedures in the courts of two states required by the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, NMSA 1978, §§ 31-8-1 to -6 (1937, as amended through 1953) (Uniform Act). The State apparently never initiated any procedures under the Uniform Act, either before defense counsel's initial acquiescence to the Skype testimony or after counsel's reversal of that position one week later. The State has made no showing that it could have secured the in-person attendance of the witness had counsel objected instantly

14

when the State first raised the unavailability problem just two weeks before trial, and the State did not argue how the one-week period made a difference in its ability to do so. We therefore find no factual support for the State's waiver by estoppel theory.

**2.      Defendant's objection to the violation of his confrontation rights was preserved because the district court was alerted to the error**

{22}      Even in the absence of a formal waiver of rights, our law still requires that a defendant preserve a question for appellate review by fairly invoking a ruling or decision by a trial court. Rule 12-216(A) NMRA. "A party must assert its objection and the basis thereof with 'sufficient specificity to alert the mind of the trial court to the claimed error.'" *Zamarripa*, 2009-NMSC-001, ¶ 33 (citation omitted). We therefore address the State's argument that defense counsel failed to preserve the confrontation issue by not making a specific objection to the Skype testimony during trial.

{23}      The record reflects that the district court was alerted to the confrontation issue in the hearing a week before the trial began when defense counsel specifically advised the court on the record that he had been rethinking the Skype testimony issue raised the previous week and stated, "[W]e're thinking it's going to cause a confrontation problem." The court clearly addressed the issue when it responded to the confrontation claim by ruling that defense counsel had waived his client's right

15

to object and telling counsel, "You can note your objections on confrontation grounds." The issue was therefore sufficiently brought to the attention of the court and preserved for appellate review, whether or not counsel articulated a repeated objection during the trial. *See Samora*, 2013-NMSC-038, ¶ 14 ("[W]e review an issue for reversible error only when the defendant has properly raised the issue in the district court. . . . 'Unless the trial court's attention is called in some manner to the fact that it is committing error, and given an opportunity to correct it, cases will not be reversed because of errors which could and would have been corrected in the trial court, if they had been called to its attention.'" (citation omitted)); *State v. Mason*, 1968-NMCA-072, ¶ 12, 79 N.M. 663, 448 P.2d 175 (holding that a defendant need not renew an objection at trial when the issue is fully preserved prior to trial).

**3.    The presentation of Skype testimony violated Defendant's confrontation rights**

{24}    The central purpose of the Confrontation Clause, to ensure the reliability of evidence, is served by "[t]he combined effect of . . . physical presence, oath, cross-examination, and observation of demeanor by the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 846 (1990). In *Craig*, the United States Supreme Court considered whether the Confrontation Clause allows a child victim of abuse to testify at trial over one-way closed circuit television while physically located in a room

16

separate from the judge, the jury, and the defendant who nevertheless hear and see the testimony. *Id.* at 840-41, 850 (holding that "the face-to-face confrontation requirement is not absolute . . . , [but neither is it] easily . . . dispensed with. . . . [A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured"). *Craig* emphasized that the video testimony was given under oath, was subject to cross-examination, and allowed the fact-finder to observe the demeanor of the witness. *Id.* at 851. In declining to hold that the child's testimony was given as an out-of-court statement, the Court noted that the "assurances of reliability and adversariness [were] far greater than those required for admission of hearsay testimony under the Confrontation Clause." *Id.*

{25}     Then, in *Crawford v. Washington*, 541 U.S. 36, 61-65 (2004), the United States Supreme Court abandoned its previous reliability-focused approach and "adopted a fundamentally new interpretation of the confrontation right, holding that [t]estimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine," without regard to the reliability of particular substitutes for

17

confrontation. *Williams v. Illinois*, ___U.S.___, ___, 132 S. Ct. 2221, 2232 (2012) (alterations in original) (internal quotation marks and citation omitted). *Crawford* reaffirmed that "the Clause's ultimate goal is to ensure reliability of evidence" but relied on the history of the common-law right to confrontation to interpret the Confrontation Clause as "a procedural rather than a substantive guarantee [that] commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." 541 U.S. at 61.

{26} *Crawford* may call into question the prior holding in *Craig* to the extent that *Craig* relied on the reliability of the video testimony. But the face-to-face aspect of confrontation was not at issue in *Crawford*, and *Crawford* did not overrule *Craig*. *See United States v. Yates*, 438 F.3d 1307, 1314 n.4 (11th Cir. 2006) (stating that *Craig* remains the proper test for the admissibility of live two-way video testimony under the Confrontation Clause and declining to apply *Crawford*); *People v. Gonzales*, 281 P.3d 834, 863 (Cal. 2012) (rejecting the argument that *Craig* was no longer good law after *Crawford*); *State v. Jackson*, 717 S.E.2d 35, 39-40 (N.C. Ct. App. 2011) (acknowledging that part of *Craig*'s rationale seems inconsistent with *Crawford* but explaining that they address distinct confrontation questions and agreeing with the weight of authority that *Crawford* did not overrule *Craig*); *State v. Henriod*, 2006 UT

18

11, ¶ 16, 131 P.3d 232 (reasoning that *Crawford* did not implicitly overrule *Craig* because *Crawford* did not mention video transmission of testimony given during trial, which had previously been a subject of debate among the Justices and so was unlikely to have been inadvertently overlooked). We conclude that *Craig* remains controlling law when a witness does testify at trial but the defendant is nevertheless denied physical face-to-face confrontation.

{27}     Under *Craig*, the necessity of the substitute procedure to further an important state interest is the critical inquiry. *See* 497 U.S. at 852. A trial court must hear evidence and make a case-specific determination of necessity as it pertains to the particular witness. *See id.* at 855. *Craig* dealt with one-way video transmission, and we have not previously applied it to a live two-way video connection. *See State v. Fairweather*, 1993-NMSC-065, ¶¶ 25-26, 34, 116 N.M. 456, 863 P.2d 1077 (holding, pre-*Crawford*, that the admission of deposition testimony videotaped out of the presence of the defendant, who sat at a remote monitor to see and hear the testimony live, was consistent with *Craig* after the trial court made individualized findings of necessity in furtherance of public policy). The United States Supreme Court has never adopted a specific standard for two-way video testimony, but we doubt it would find any virtual testimony an adequate substitute for face-to-face confrontation without

at least the showing of necessity that *Craig* requires. The United States Supreme Court rejected a proposed amendment to Rule 26(b) of the Federal Rules of Criminal Procedure that would have allowed unavailable witnesses to testify via two-way video. *See Order of the Supreme Court*, 207 F.R.D. 89 (2002). In a filing related to the rejection, Justice Antonin Scalia wrote,

> I cannot comprehend how one-way transmission . . . becomes transformed into full-fledged confrontation when reciprocal transmission is added. As we made clear in *Craig*, [497 U.S.] at 846-47, a purpose of the Confrontation Clause is ordinarily to compel accusers to make their accusations *in the defendant's presence*—which is not equivalent to making them in a room that contains a television set beaming electrons that portray the defendant's image. Virtual confrontation might be sufficient to protect virtual constitutional rights; I doubt whether it is sufficient to protect real ones.

*Id.* at 94; *see also* Nancy Gertner, *Videoconferencing: Learning Through Screens*, 12 Wm. & Mary Bill Rts. J. 769, 786 (2004) (providing perspectives of an experienced federal trial judge and cautioning that "in live testimony, face-to-face transmission plainly increases the information available to the fact-finder").

{28}    Our Court of Appeals has consistently applied *Craig* when analyzing the admissibility of live two-way video testimony under the Confrontation Clause. *See Schwartz*, 2014-NMCA-066, ¶¶ 6, 14 (determining error under the Confrontation Clause in the admission of two-way video testimony where findings of necessity in

the service of public policy were insufficient); *State v. Smith*, 2013-NMCA-081, ¶¶ 8, 12, 308 P.3d 135 (same); *State v. Chung*, 2012-NMCA-049, ¶¶ 11-12, 290 P.3d 269 (same). The vast majority of courts from other jurisdictions, both federal and state, are in accord. *See, e.g.*, *United States v. Abu Ali*, 528 F.3d 210, 240-41 (4th Cir. 2008) (applying *Craig* to an analysis of the admissibility of two-way video testimony under the Confrontation Clause); *Yates*, 438 F.3d at 1313-16 (applying *Craig* to test the admissibility at trial of two-way video and listing cases from the Sixth, Eighth, Ninth, and Tenth Circuits that have done the same); *State v. Rogerson*, 855 N.W.2d 495, 503-04 (Iowa 2014) (acknowledging that live two-way video testimony is different than the one-way connection addressed in *Craig* but relying on cases from numerous state and federal jurisdictions to conclude that *Craig* is still applicable); *State v. Stock*, 2011 MT 131, ¶¶ 25, 30, 361 Mont. 1, 256 P.3d 899 (applying *Craig* to determine the admissibility of two-way video testimony after holding that *Crawford* did not overrule *Craig*). *But see United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999) (declining to adopt *Craig*'s requirement of necessity for two-way video testimony but nevertheless requiring a finding of exceptional circumstances where the use of two-way video testimony will further the interests of justice).

{29}     We adopt the *Craig* standard here in our analysis of the admissibility of two-

way video testimony. A criminal defendant may not be denied a physical, face-to-face confrontation with a witness who testifies at trial unless the court has made a factual finding of necessity to further an important public policy and has ensured the presence of other confrontation elements concerning the witness testimony including administration of the oath, the opportunity for cross-examination, and the allowance for observation of witness demeanor by the trier of fact.

{30} Nothing in the record of this case demonstrates that the use of two-way video was necessary to further an important public policy as required by *Craig*. The district court did not conduct an evidentiary hearing or enter any findings on the issue. Because the required findings were not made, we hold that the admission of remote testimony violated Defendant's right to confrontation. Inconvenience to the witness is not sufficient reason to dispense with this constitutional right. *Schwartz*, 2014-NMCA-066, ¶ 7.

{31} The State does not argue that the *Craig* standard was met but instead asserts that there was no confrontation violation because the forensic analyst was unavailable to present live testimony and Defendant was able to cross-examine her through the audiovisual Skype connection. *See Crawford*, 541 U.S. at 53-54 (allowing testimonial statements to be admitted under the Confrontation Clause when the witness is

22

unavailable and the defendant has had a prior opportunity to cross-examine). Assuming for the sake of argument that *Crawford* can be applied to analyze the admissibility of testimony given at trial over live video as if the statements were made out of court, the requirements of unavailability and cross-examination must still be met.

{32}    An out-of-state witness is not generally considered unavailable for the purpose of the admission of out-of-court statements unless the proponent of that witness's testimony has complied with the Uniform Act. *See State v. Martinez*, 1984-NMCA-106, ¶¶ 10-11, 102 N.M. 94, 691 P.2d 887 (holding, pre-*Crawford*, that although "[o]ur prior cases have insisted on strict compliance with the Uniform Act before an out-of-state witness may be declared unavailable," a prosecutor's untimely and unsuccessful use of the Uniform Act was excusable when the witness had responded to three prior subpoenas and the state reasonably expected him to respond to a fourth in the same manner). After *Crawford*, the State must still comply with the Uniform Act, and it failed to do so in this case despite knowing weeks in advance of trial that the witness might not willingly attend. Accordingly, we conclude that the State has failed to establish the legal unavailability of the witness, and we need not determine whether cross-examination over Skype is sufficient to fulfill *Crawford*'s

23

requirements. Under current United States Supreme Court Confrontation Clause jurisprudence, Defendant's Sixth Amendment right to confrontation was violated by the admission of the video testimony.

**4.      The violation of Defendant's confrontation rights was not harmless error**

{33}      "Improperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful." *State v. Tollardo*, 2012-NMSC-008, ¶ 25, 275 P.3d 110. When an error is constitutional, it is harmless only if the challenger can prove there is no reasonable possibility that the error affected the verdict. *Id.* ¶ 36. We must reverse a conviction if the erroneously admitted evidence might have contributed to it. *Id.* ¶ 40.

{34}      The State argues that the admission of this two-way video testimony was harmless error because another forensic analyst was present in court and properly testified to her preparation of a report comparing the DNA profiles developed by the absent forensic analyst. But the existence of other evidence to support the verdict does not cure a constitutional error when there is a reasonable possibility that the erroneously admitted evidence influenced the jury's verdict. *See id.* ¶¶ 40, 43 (stating that the existence of other evidence to support a conviction may be considered to understand the role that erroneously admitted evidence played in the trial but may not

be the "focus of the harmless error analysis"). "The Court's focus is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *State v. Ortega*, 2014-NMSC-017, ¶ 20, 327 P.3d 1076 (internal quotation marks and citation omitted). The expert witness who testified via Skype was the only APD forensic scientist analyst who had actually performed measurements on the DNA samples in this case. Her involvement in the case was significant, and she testified to the results of the measurements she performed. The DNA profiles were offered as the sole evidence that implicated Defendant in this crime. We conclude that there is no reasonable possibility the testimony of the absent forensic analyst did not influence the verdict and accordingly that the error was not harmless.

{35}     Although an error may be prejudicial with respect to one conviction and harmless with respect to another, *Tollardo*, 2012-NMSC-008, ¶ 44, we need not separately assess the effect of the error on each conviction in this case because the erroneously admitted DNA evidence was all that implicated Defendant in any crime. We reverse both of Defendant's convictions.

**C.     Retrial Is Allowed Only If Sufficient Evidence Supported Defendant's Convictions**

{36} Although the violation of Defendant's right to confrontation requires us to reverse his convictions, we still must address the sufficiency of the evidence to determine whether retrial would be barred on double jeopardy grounds. *State v. Cabezuela*, 2011-NMSC-041, ¶ 47, 150 N.M. 654, 265 P.3d 705. On remand, Defendant is entitled to an acquittal on a charge if the evidence presented at trial was insufficient to support his conviction. *State v. Consaul*, 2014-NMSC-030, ¶ 41, 332 P.3d 850.

{37} In determining the sufficiency of the evidence, we review the evidence "in the light most favorable to the State, resolving all conflicts and making all permissible inferences in favor of the jury's verdict." *Id.* ¶ 42 (internal quotation marks and citation omitted). Viewed in this manner, substantial evidence must exist that would allow a rational trier of fact to find that each element of the crime has been established beyond a reasonable doubt. *Id.*

**1.      Sufficient evidence supports Defendant's first-degree deliberate intent murder conviction**

{38} To prove first-degree deliberate murder, the State was required to prove that Defendant killed Ashford with the deliberate intention to take away her life. *See* NMSA 1978, § 30-2-1(A)(1) (1994) ("Murder in the first degree is the killing of one

26

human being by another . . . by any kind of willful, deliberate and premeditated killing."); UJI 14-201 NMRA ("The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action" and requires a "calculated judgment" to kill, although it "may be arrived at in a short period of time."). Defendant argues that the jury verdict was inherently speculative because the DNA evidence did not adequately prove that Defendant was the killer and because some hallmarks of deliberate intent, such as motive or careful planning, were missing.

{39} There was sufficient evidence to allow a trier of fact to reasonably infer that it was Defendant who killed Ashford. Physical evidence containing a full DNA profile matching Defendant was found on Ashford's body in semen on her thigh and under the fingernails of her right hand, and also on the paver stone presumed to be the murder weapon. The jury was informed that unidentified DNA was also present and was alerted in closing arguments to consider the possibility that another person or other people could have been involved.

{40} Additionally, the State presented substantial evidence at trial to raise a reasonable inference of deliberate intent. This Court previously concluded there was sufficient evidence for a rational jury to infer deliberate intent under factual

27

circumstances similar to those here based on evidence of a prolonged struggle and the large number of the victim's wounds. *See State v. Duran*, 2006-NMSC-035, ¶¶ 9, 11, 140 N.M. 94, 140 P.3d 515; *see also State v. Flores*, 2010-NMSC-002, ¶ 22, 147 N.M. 542, 226 P.3d 641 (concluding that there was sufficient evidence of deliberate intent where the defendant stabbed the victim with a screwdriver "so many times that it evidenced an effort at overkill").

{41} Defendant concedes that a large number of wounds, such as those sustained by Ashford, can indicate deliberation. The fact that the number of wounds could instead indicate impulsivity, as Defendant argues, does not mean that the jury was required to interpret them that way or, when combined with the evidence of dragging the incapacitated Ashford followed by further assault, that deliberation and impulsivity are equally possible so as to have required the jury to speculate. *See State v. Vigil*, 2010-NMSC-003, ¶ 20, 147 N.M. 537, 226 P.3d 636 (reversing a conviction because the "chain of inferences" supporting the verdict amounted to no more than "guess or conjecture" and stating that the jury may not speculate to reach the conclusions necessary to the verdict). There was sufficient evidence for a rational trier of fact to conclude that Defendant was the killer and that the killing was deliberate.

**2.    There was insufficient evidence to support Defendant's kidnapping conviction**

{42}     To support a kidnapping conviction under New Mexico law, the State must prove an "unlawful taking, restraining, transporting or confining of a person, by force, intimidation or deception, with intent . . . to inflict death, physical injury or a sexual offense." NMSA 1978, § 30-4-1(A)(4) (2003); *see also* UJI 14-403 NMRA. The State based its case for kidnapping on evidence showing that Ashford was initially assaulted in the small parking lot, then dragged to the edge of the lot behind a trash can where she was struck again at least once and where she was later found. Blood was found in two places within the parking lot, and there were drag marks showing her body had been moved. The State also relied on this evidence to support the charge of deliberate murder and informed the jury in closing arguments that it should consider the evidence in establishing both charges.

{43}     New Mexico's kidnapping statute is broadly worded and often encompasses conduct that occurs during the commission of another crime. *See State v. Trujillo*, 2012-NMCA-112, ¶¶ 23-29, 289 P.3d 238 (discussing the history of kidnapping statutes and the types of conduct intended for punishment). We give effect to the plain meaning of a statute only when that will "not render the statute's application absurd, unreasonable, or unjust." *State v. Rowell*, 1995-NMSC-079, ¶ 8, 121 N.M. 111, 908 P.2d 1379 (internal quotation marks and citation omitted). "[V]irtually every

29

assault, sexual assault, robbery, and murder involves a slight degree of confinement or movement." *Trujillo*, 2012-NMCA-112, ¶ 23 (internal quotation marks and citation omitted). To allow a kidnapping conviction to be based upon this incidental conduct can give rise to serious injustice by increasing punishment so as to render it disproportionate to culpability. *See id.* ¶ 24. The Legislature did not intend to punish as kidnapping conduct that is "merely incidental to another crime." *Id.* ¶ 39. Where no evidence establishes a kidnapping separate from that of acts predictably involved in another crime, the conviction cannot be sustained. *See id.* ¶¶ 39, 41.

{44}     Any restraint here occurred during the commission of one continuous attack that ended in murder. This is in contrast to our cases upholding convictions for both kidnapping and murder, where separate evidence proved each crime. *See, e.g.*, *State v. Saiz*, 2008-NMSC-048, ¶ 33, 144 N.M. 663, 191 P.3d 521 (upholding convictions for both murder and kidnapping where the initial motive to restrain the victim was to commit a sexual assault, and the murder took place after the assault), *overruled on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36 & n.1, 146 N.M. 357, 210 P.3d 783; *State v. Jacobs*, 2000-NMSC-026, ¶¶ 24-25, 129 N.M. 448, 10 P.3d 127 (upholding convictions for both murder and kidnapping where the evidence showed either a kidnapping by deception prior to the murder, based on the defendant's false

30

pretenses causing the teenage victim to associate with him, or a kidnapping by separate restraint for the purpose of sexual assault or during the victim's hundred-yard walk to her death). The evidence here indicates that the events all took place along one side of a small parking lot. The drag marks appear to extend less than ten feet, within the span of one parking space. The State asserts that this act of moving Ashford was distinct from her murder but fails to describe any separate restraint that would result in a kidnapping prior to the murder. The movement across a short distance within one small isolated parking lot did not constitute a separate crime from the murder that was already in progress. We conclude that on remand, Defendant may not be retried for kidnapping because insufficient evidence supported his kidnapping conviction.

**D.    Judges Must Adhere to the Code of Judicial Conduct and Avoid Any Appearance of Impropriety When Using Electronic Social Media**

{45}    Defendant argues that social media postings by the district court judge demonstrate judicial bias. During the pendency of the trial, the district court judge posted to his election campaign Facebook page discussions of his role in the case and his opinion of its outcome. Although we need not decide this issue because we reverse on confrontation grounds, we take this opportunity to discuss our concerns over the use of social media by members of our judiciary.

31

{46} "An independent, fair, and impartial judiciary is indispensable to our system of justice." Rule 21-001(A) NMRA. Accordingly, judges must adhere to the Code of Judicial Conduct, Rules 21-100 to -406 NMRA, at all times. A judge "should expect to be the subject of public scrutiny that might be viewed as burdensome if applied to other citizens." Rule 21-102 n.2. Judges must avoid not only actual impropriety but also its appearance, and judges must "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary." Rule 21-102.

{47} These limitations apply with equal force to virtual actions and online comments and must be kept in mind if and when a judge decides to participate in electronic social media. *See* Rule 21-001(B) ("Judges and judicial candidates are also encouraged to pay extra attention to issues surrounding emerging technology, including those regarding social media, and are urged to exercise extreme caution in its use so as not to violate the Code."); New Mexico Supreme Court Advisory Committee on the Code of Judicial Conduct, Advisory Opinion Concerning Social Media, ¶ 4 (Feb. 15, 2016) ("[T]he Code . . . addresses conduct pertaining to social media use in the context of its broader rules. . . . Simply put, a judge may not communicate on a social media site in a manner that the judge could not otherwise

32

communicate.").

{48}     Social media use has led to numerous allegations of misconduct by participants in our legal system. *See, e.g.*, *United States v. Bowen*, 969 F. Supp. 2d 546, 625-27 (E.D. La. 2013) (granting the defendants' motion for a new trial on the basis of prosecutorial misconduct in posting online comments under anonymous pseudonyms that portrayed the defendants in a negative light and created "an online 'carnival atmosphere' . . . wherein justice was distorted and perverted in ways that are directly and strictly prohibited"); *Chace v. Loisel*, 170 So. 3d 802, 804 (Fla. Dist. Ct. App. 2014) (quashing an order denying a motion to disqualify a trial judge because the party's failure to respond to the judge's Facebook "friend" request created a reasonable fear of offending the judge and not receiving a fair and impartial trial); *State v. Smith*, 418 S.W.3d 38, 42, 48-49 (Tenn. 2013) (requiring an evidentiary hearing to determine whether a new trial was necessary on the basis of juror misconduct after a juror sent Facebook messages to one of the State's witnesses during trial).

{49}     While we make no bright-line ban prohibiting judicial use of social media, we caution that "friending," online postings, and other activity can easily be misconstrued and create an appearance of impropriety. Online comments are public

33

comments, and a connection via an online social network is a visible relationship, regardless of the strength of the personal connection. *See Domville v. State*, 103 So. 3d 184, 185-86 (Fla. Dist. Ct. App. 2012) (quashing an order denying disqualification of a trial judge based on a Facebook friendship with the prosecutor because the public social networking relationship was sufficient to create in a reasonably prudent person a well-founded fear of not receiving a fair and impartial trial); *but see Youkers v. State*, 400 S.W.3d 200, 204-07, 213 (Tex. App. 2013) (affirming the denial of a motion for a new trial based on a Facebook friend connection between the trial judge and the victim's father because no evidence showed that the relationship would influence the judge and lead to bias or impartiality in the case and because the judge had placed all actual Facebook communications in the record and cautioned the father not to communicate with him further regarding the case).

{50}    We recognize the utility of an online presence in judicial election campaigns, but we agree with the American Bar Association in recommending that these campaign sites be established and maintained by campaign committees, not by the judicial candidate personally. *See* ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Op. 462 (2013) (discussing *Judge's Use of Electronic Social Networking Media*). We clarify that a judge who is a candidate should post no

personal messages on the pages of these campaign sites other than a statement regarding qualifications, should allow no posting of public comments, and should engage in no dialogue, especially regarding any pending matters that could either be interpreted as ex parte communications or give the appearance of impropriety.

{51} Judges should make use of privacy settings to protect their online presence but should also consider any statement posted online to be a public statement and take care to limit such actions accordingly. *See State v. Madden*, No. M2012-02473-CCA-R3-CD, 2014 WL 931031, *8 (nonprecedential) (Tenn. Crim. App. March 11, 2014, appeal denied September 18, 2014) ("[J]udges will perhaps best be served by ignoring any false sense of security created by so-called 'privacy settings' and understanding that, in today's world, posting information to Facebook is the very definition of making it public."). A judge's online "friendships," just like a judge's real-life friendships, must be treated with a great deal of care. The use of electronic social media also may present some unfamiliar concerns, such as the inability to retrieve or truly delete any message once posted, the public perception that "friendships" exist between people who are not actually acquainted, and the ease with which communications may be reproduced and widely disseminated to those other than their intended recipients. *See United States v. Fumo*, 655 F.3d 288, 305-06 (3d Cir. 2011)

(affirming the denial of a motion for a new trial because there was no evidence of substantial prejudice to the defendant resulting from a juror's Facebook and Twitter comments during trial that were followed and rebroadcast by the media without the juror's knowledge). A judge must understand the requirements of the Code of Judicial Conduct and how the Code may be implicated in the technological characteristics of social media in order to participate responsibly in social networking. Members of the judiciary must at all times remain conscious of their ethical obligations.

## III.    CONCLUSION

{52}    Because Defendant's confrontation rights were violated, his convictions must be reversed. The evidence was sufficient to support a conviction of first-degree murder but insufficient to support a conviction of first-degree kidnapping. We therefore remand to the district court for entry of a judgment of acquittal on the kidnapping charge and retrial on the charge of first-degree murder.

{53}    **IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Chief Justice**

36

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**BARBARA J. VIGIL, Justice**

**JUDITH K. NAKAMURA, Justice, not participating**